Lancaster Transportation Company et al., Appellants, *v.* Pennsylvania Public Utility Commission.

130

Argued March 22, 1956. Before Rhodes, P. J., Hirt, Gunther, Wright, Woodside, Ervin, and Carr, JJ.

*H. Clay Burkholder*, with him *W. G. Johnstone, Jr.*, and *Windolph & Johnstone*, for appellant.

*Richard V. Zug*, with him *Edmonds, Obermayer & Rebmann*, for appellant.

*Robert C. Fluhrer*, with him *Fluhrer, Medill & Shelley*, for appellant.

*James H. Booser* and *McNees, Wallace & Nurick*, for appellant.

*Frank Rogers Donahue, Jr.* and *John B. Gest*, for appellant.

*Owen B. McManus*, Assistant Counsel, and *Paul E. Beaver* and *John W. Mentzer*, Assistant Counsel, and *Thomas M. Kerrigan*, Acting Counsel, for Pennsylvania Public Utility Commission.

*Robert H. Shertz*, for intervening appellee.

*Frank Rogers Donahue, Jr.* and *John B. Gest*, for intervening appellee.

OPINION BY RHODES, P. J., July 17, 1956:

These appeals are by protestant motor carriers from orders of the Pennsylvania Public Utility Commission granting the right of interchange to Highway Express Lines, Inc., hereinafter called "Highway," and to Shirk's Motor Express Corporation, hereinafter called "Shirk."

Highway is the holder of a certificate of public convenience authorizing it to transport property as a motor carrier between points within the City and County of Philadelphia, and the territory included within a line beginning at Marcus Hook, Delaware County, passing through Cheyney, Delaware County, West Chester, Coatesville, and Phoenixville, Chester County, Perkasie, Newton, Rushland, and Morrisville, Bucks County, and extending along the Delaware River from Morrisville to Marcus Hook.

Shirk is authorized to provide motor carrier service over a series of routes in Lancaster and Chester Counties with certain limitations which are not pertinent here. The point of interchange, West Chester, is common to both carriers. The applications as filed by Highway and Shirk sought approval of the commission for an interchange at West Chester of shipments originating in the area served by Highway, and shipments originating on the routes of Shirk in Lancaster and Chester Counties. With a slight exception, the two areas are entirely separate.

The interchange service between Highway and Shirk covering the respective areas was voluntarily begun by them in 1949, and resulted in complaints being filed by competing carriers. The complaints were dismissed by the commission. On appeal we held (July 19, 1951) the interchange to be unlawful because it was additional and supplemental to the original certificates of Highway and Shirk and as such required the establishment in a proper application proceeding that it was neces-

sary or proper for the service of the public. *Lancaster Transportation Co. v. Pennsylvania Public Utility Commission*, 169 Pa. Superior Ct. 284, 82 A. 2d 291. A reargument was denied and an allocatur was refused (170 Pa. Superior Ct. xxvii). Highway and Shirk nevertheless continued the unlawful interchange until the commission issued its cease and desist order on October 20, 1952. On November 26, 1951, Highway filed an application for amendment of its certificate to permit such interchange service, and on April 18, 1952, Shirk filed a similar application. Extensive hearings were held, and by orders of July 26, 1954, the commission approved the amendments thereby permitting the interchange. These appeals were then filed by four protesting carriers. The Reading Transportation Company, a protestant, petitioned to intervene. Highway Express Lines, Inc., and Shirk Motor Express Corporation were allowed to intervene as appellees.

On October 1, 1954, we remanded the records to the commission for further study and consideration and for the making of specific and detailed findings of fact. On September 26, 1955, the commission affirmed its original orders of July 26, 1954, by the order which is presently before us.

As a matter of fact, in the proceedings before the commission applicants requested and were granted the right to reestablish the interchange service which they had previously been rendering. Thirty-one shipper and consignee witnesses testified in support of the applications. Only 5 had not been using the unlawful interchange service prior to its discontinuance. Upon reading the testimony of the 26 witnesses, we are obliged to conclude, as did the commission, that the service provided by applicants was far superior to any other service used by them prior to or since the cease and desist order. The service rendered by applicants was

prompt in pick-up and overnight in delivery, while other service generally involved delays in pick-up and second to fourth day delivery in many instances. The difference in the types of service became very apparent after applicants were compelled to discontinue the interchange. Although on occasion other service may have been satisfactory, it was generally unsatisfactory when compared with that to which the shippers had become accustomed from applicants, and frequently resulted in complaints from consignees. The 5 witnesses who had not previously used applicants' service testified to the general inadequacy of other service either in whole or in part, and they expressed their desire to have the type of service which applicants again proposed to render.

Appellants have stressed the fact that many of the witnesses testified that the existing service was satisfactory to some extent and that some shippers had not used or tried to use other carriers. For these reasons appellants argue that our comments in *Modern Transfer Co. v. Pennsylvania Public Utility Commission,* 179 Pa. Superior Ct. 46, 115 A. 2d 887, are especially pertinent. We there said (page 54 of 179 Pa. Superior Ct., page 891 of 115 A. 2d, quoting from *Modern Transfer Co., Inc., v. Pennsylvania Public Utility Commission,* 139 Pa. Superior Ct. 197, 208, 12 A. 2d 458, 463) : " 'In some isolated cases there were complaints as to the manner in which some particular utility had served that shipper, but there were still other carriers available which held certificates.' " In the last *Modern Transfer* case (179 Pa. Superior Ct. 46, 115 A. 2d 887), we were commenting upon the factual state of the record there involved. But that case is not factually the same as the instant case. In the present proceedings the complaints were neither isolated nor of minor importance. On the contrary, they were frequent and substantial, indicating that other carriers did not consist-

ently render service of the type and character established by applicants. The fact that some shippers had not attempted to use the services of a few of the existing carriers does not detract from the conclusion. The inadequacy of all the protestants need not be shown by the same witnesses. However, it was amply established by a number of witnesses. For instance, several shippers stated that since the discontinuance of the Highway-Shirk interchange they had tried several other carriers, but that none rendered service of applicants' quality. There were numerous complaints of delay in pick-up. In fact, some shippers used their own trucks in preference to the slow service in that respect of local carriers. The most that can be said is that protestants rendered an inconsistent although sometimes satisfactory service. In *Modern Transfer Co. v. Pennsylvania Public Utility Commission,* supra, 179 Pa. Superior Ct. 46, 53-55, 115 A. 2d 887, the commission's finding of public necessity could not be supported merely by testimony as to a few isolated complaints, especially in view of the nature of the territory and the extensive and comprehensive authority sought. We are of the opinion that the finding of necessity in the instant case is supported by the record as a whole, which establishes the general inadequacy of other service and the need for applicants' proposed service. See *Garner v. Pennsylvania Public Utility Commission,* 177 Pa. Superior Ct. 439, 453, 110 A. 2d 907. The grants of the additional authority will not be defeated merely because there is some testimony that the service of other carriers may be at times satisfactory. Moreover, we cannot say, as a matter of law, that the commission did not give proper weight to the evidence in this record, nor can we say that it acted capriciously. See *Pittsburgh v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 224, 230, 101 A. 2d 127.

It is true that the burden was upon applicants to show that the existing service was not of the type and character which satisfies the public need and convenience, and that the proposed service would tend to correct or substantially improve that condition. *Modern Transfer Co., Inc. v. Pennsylvania Public Utility Commission*, 139 Pa. Superior Ct. 197, 206, 12 A. 2d 458. See, also, *Kulp v. Pennsylvania Public Utility Commission*, 153 Pa. Superior Ct. 379, 382, 33 A. 2d 724; *Garner v. Pennsylvania Public Utility Commission*, supra, 177 Pa. Superior Ct. 439, 450, 110 A. 2d 907; *Motor Freight Express v. Pennsylvania Public Utility Commission (No. 1)*, 180 Pa. Superior Ct. 294, 306, 119 A. 2d 661. In the present proceedings it was permissible that the public need be shown in part by the number of requests for applicants' service. *H. J. Gongaware & Sons v. Pennsylvania Public Utility Commission*, 163 Pa. Superior Ct. 9, 10, 60 A. 2d 364; *Ruettger v. Pennsylvania Public Utility Commission*, 164 Pa. Superior Ct. 388, 393, 64 A. 2d 675; *Modern Transfer Co., Inc. v. Pennsylvania Public Utility Commission*, supra, 139 Pa. Superior Ct. 197, 204, 12 A. 2d 458. The burden was further met by substantial evidence of applicants' prior consistently superior service and by proof of protestants' general failure to meet this established type with any regularity. We think on this record the commission could justifiably conclude that the reestablishment of applicants' service would substantially improve the condition then existing.

It is quite apparent that the interchange service which applicants previously rendered was of a high quality and was consequently to their advantage in these proceedings. Much of the evidence which was introduced related to this prior service and to a comparison with existing service. Unquestionably the commission gave considerable weight to this evidence. After

discussing the testimony of the witnesses in detail the commission observed:

"The evidence establishes that these shippers have been unable to obtain sufficient service particularly on less-than-carload shipments and it is to be noted that protestants have on occasions either rejected small shipments or have unreasonably delayed providing the service for them. The evidence as outlined indicates that there is a need for better service than now being rendered by protesting carriers.

"In summary, necessity for the interchange service is firmly established by the testimony and evidence relating to the actual shipments involved in the interchange at West Chester. The additional testimony not only shows that the public used and had come to rely upon the service rendered by applicants, but also, that there is a present need for the service as present service does not adequately take care of shipping requirements."

The evidence supports these statements of the commission. The service necessary to meet the public need is essentially a matter for the commission. See *Pittsburgh & Lake Erie Railroad Co. v. Pennsylvania Public Utility Commission*, 170 Pa. Superior Ct. 411, 420, 85 A. 2d 646. The commission recognizes that an adequate and reasonable service was that which had been provided by applicants with consistency and not that which protestants rendered occasionally. "The public are interested in obtaining not only an economical but a dependable service, . . . It is the duty of the commission to adjust conflicting interests so that efficient service will be available. The proper adjustments are to be made by the commission, for it is to that body that the legislature has entrusted the duty of determining who and how many shall serve a given area. It requires proof of an unusual situation before we are warranted in interfering with the duties so entrusted

to the commission." *Modern Transfer Co., Inc. v. Pennsylvania Public Utility Commission,* supra, 139 Pa. Superior Ct. 197, 203, 12 A. 2d 458, 461. See *Kulp v. Pennsylvania Public Utility Commission,* supra, 153 Pa. Superior Ct. 379, 383, 33 A. 2d 724.

Appellants contend that it was error for the commission to consider evidence of the service rendered unlawfully by applicants in support of their applications. Their concern in this respect is understandable because without such evidence there is little to support the grant of the interchange rights. As we have indicated, applicants on their own initiative began the interchange service in 1949, and continued such service until the cease and desist order of October 20, 1952. During this period they acquired experience and a reputation for superior service to the public. In principle, we must agree with appellants' contention in part, but we disagree with the attempted application to the present proceedings.

The mere fact of prior operation without commission approval is not per se equivalent to an offense which will prohibit absolutely the acquisition of proper authority when application is subsequently made. The distinction between those violations which are prohibitive and those which will be accepted as competent evidence is, to a large degree, dependent upon the existence of good faith. If the violation is the result of a bona fide misunderstanding of the service authorized by the commission, there is no substantial basis, either legally or morally, to object to its use in a certification proceeding. *Motor Freight Express v. Public Service Commission,* 117 Pa. Superior Ct. 165, 169, 173, 177 A. 490; *Arrow Carrier Corporation v. Public Service Commission,* 120 Pa. Superior Ct. 570, 575, 182 A. 711; *Cage v. Public Service Commission,* 125 Pa. Superior Ct. 330, 336, 337, 189 A. 896. On the other hand, where

the violation is one resulting from a deliberate disregard of the certificate limitations or the law, then, of course, the wrongdoer should not profit from his own deliberate wrong. In the instant case it can be said that the interchange was carried on under a bona fide misunderstanding at least to the date of the decision of this Court on July 19, 1951, wherein we held it to be unlawful. *Lancaster Transportation Co. v. Pennsylvania Public Utility Commission,* supra, 169 Pa. Superior Ct. 284, 82 A. 2d 291. From and after that date, applicants were on notice that the interchange was violative of the law, and their persistence in its continuation until compelled to cease and desist by order of the commission cannot be excused, notwithstanding petition for reargument, petition for allocatur, and the delay by the commission in issuing the cease and desist order. We agree that evidence relating to service after a bona fide misunderstanding had ended should not have been admitted or made the basis of the commission's orders. Unfortunately, on the record before us there is no separation of the evidence which will enable us to determine the nature and extent of the performance in the respective periods. However, of the 26 witnesses who had used the Highway-Shirk interchange, 21 had used it almost from its inception to the date of the cease and desist order; 5 did not begin using it until about the time of the decision of this Court in 1951 or thereafter. The evidence indicates that at all times the service of applicants was superior to that of the others. Since the service rendered before our decision covered a substantial period (1949 to July, 1951), we think that this evidence, being competent, sufficiently established the need for applicants' better service. Consequently, as a practical matter, we must sustain the commission's action, first, because we cannot make any distinction between the periods from

the evidence, and, secondly, because the service of applicants was consistently good. We do so, however, with a reservation that such violations are not to be condoned and rewarded when the misunderstanding ceases to be predicated on good faith.

Finally, appellants have presented a procedural question; they assert that the commission erred in failing to consider separately the different areas. Their position is that the commission should have first considered the area served by appellants directly, that is, the immediate Philadelphia area as distinguished from that outside of Philadelphia where they also are obliged to interchange freight. The territory involved is that served by Highway, and its certificate indicates that it is authorized, as a class D carrier, to transport property between points within the City and County of Philadelphia, and the territory reaching from Morrisville through Perkasie, Coatesville, West Chester, and Marcus Hook. The evidence as presented related to a number of points in this territory, and of the 31 shipper witnesses 15 were concerned with the City and County of Philadelphia. Of the 15, five were also interested in the suburban area. In addition there were 16 shipper witnesses interested only in the suburban area. The evidence relating to both areas was essentially the same; it was, in substance, as we have previously indicated. The public need for the requested service in both areas was equally established. To require the commission to subdivide its consideration under these circumstances would be an unnecessary formalism. The commission has discretion to consider applications in such manner as is logical and reasonably convenient; we find no abuse of its discretion under the present circumstances. Possibly it would have been easier for us to review the commission's orders had the areas been separately considered by the com-

mission, but we have encountered no great difficulty because of the failure to do so. Cf. *Motor Freight Express v. Pennsylvania Public Utility Commission (No. 1)*, supra, 180 Pa. Superior Ct. 294, 301, 302, 119 A. 2d 661. We have often said that the commission need not make findings as detailed in these cases as in rate cases. The basic requirement is that the commission's order be sufficiently specific to enable us to determine the controverted questions and whether proper weight was given to the evidence. Section 1005, Art. X, of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1395; *Noerr Motor Freight, Inc. v. Pennsylvania Public Utility Commission*, 180 Pa. Superior Ct. 62, 69, 118 A. 2d 248.

Applicants' prior service demonstrated to the public, and to the commission, the type and character of service which could be reasonably expected to be rendered consistently. It would not seem that any other service, if inferior, could be considered adequate or reasonable. We have said in comparable situations that the continued competition of applicants, in addition to meeting a need not furnished by protestants, should tend on the whole to induce the rendering of an improved service by other carriers. *Yellow Cab Co. v. Pennsylvania Public Utility Commission*, 161 Pa. Superior Ct. 41, 52, 54 A. 2d 301; *Motor Freight Express v. Pennsylvania Public Utility Commission (No. 1)*, supra, 180 Pa. Superior Ct. 294, 307, 119 A. 2d 661.

Our statement in *Motor Freight Express v. Public Service Commission*, supra, 117 Pa. Superior Ct. 165, 173, 177 A. 490, 493, is applicable to the present proceedings: "We think the evidence upon this record is sufficient, both as to quantity and quality, to show that approval of the application . . . would not only be proper for the accommodation and convenience of many shippers along the routes, but will permit the continu-

ance of a public service of which they have availed themselves and of which they stand in need."

The orders of the commission are affirmed.